### NAZARETH INTERNATIONAL, INC., Appellant

v.

### J.C. PENNEY COMPANY, INC. and J.C. Penney Corporation, Inc., Appellees.

No. 05–07–01578–CV.

Court of Appeals of Texas, Dallas.

June 12, 2009.

454

Robert J. Filteau, John A. Sullivan, III, Law Offices of Filteau & Sullivan, Ltd., LLP, Houston, for Appellant.

Nicholas Alban O'Kelly, Esq., Plano, TX, for Appellee.

Before Justices WRIGHT, RICHTER, and MAZZANT.[1]

## OPINION

Opinion by Justice WRIGHT.

Nazareth International, Inc. ("NI") appeals a take-nothing jury verdict in favor of J.C. Penney Company, Inc. and J.C. Penney Corporation, Inc. (collectively referred to as "Penney"). In four issues, NI challenges the factual sufficiency of the evidence to support the following jury findings: (1) Penney paid the price for the apparel it accepted from NI; (2) Penney did not loan money to NI; (3) Penney committed no fraud against NI; and (4) Penney's agent, Aaron Bonham, did not make a negligent misrepresentation upon which NI relied. We affirm.

## Background

Nazareth Century Mills ("NCM") supplied merchandise to Penney. In April of 2002, before NCM completed delivery of its latest orders with Penney, NCM filed for bankruptcy protection and created a new company, NI. NCM surrendered all of its assets, including the unfilled Penney purchase orders to its secured creditor. The secured creditor then sold the NCM assets, including the unfilled Penney orders, to NI. NI applied for and obtained a new supplier number from Penney so that it could fill the outstanding orders of NCM. Based upon the ship dates recorded in the purchase orders between Penney and NCM and the location of the goods, NI knew that it would not be able to ship certain goods to Penney in a timely manner.

On April 30, 2002, NI executed the Penney Electronic Data Interchange Trading Partner Agreement ("TPA"). As described in the TPA, Penney and NI entered the TPA to "facilitate purchase and sale transactions by electronically transmitting and receiving data in agreed formats in substitution for conventional paper-based documents...." Section 3.1 of the TPA provides:

*Section 3.1—Terms and Conditions.* This Agreement is to be considered part of any other written agreement referencing it or referenced in the Appendix under the heading "EXISTING AGREEMENTS/TERMS AND CONDITIONS". It is expressly understood by the parties that nothing in this Agreement supersedes any written agreement entered into by the parties on the forms referenced in the Appendix and any modification to this or those agreements must be approved by the parties in writing. In the absence of any other written agreement applicable to any Transaction made under this Agreement, the Transaction (and any related communication) will also be subject to Penney's standard Terms and Conditions governing domestic purchase contracts as referenced in the Appendix, including any amendment to those contracts. If any other document, whether in written or electronic form, contains any language which would modify, release or discharge [NI] from any of its obligations under this Agreement or any agreement referenced in the Appendix, that language will be of no effect unless reference is made, in writing, to this Section 3.1 and/or to the other agreement and, in either case, the document is acknowledged and accepted in writing by an authorized representative of Penney.

1. The Honorable Amos L. Mazzant was a member of the original panel and participated in submission of this case. Since submission,

Justice Mazzant has accepted appointment as a United States Magistrate Judge and did not participate in this opinion.

The terms and conditions of Penney's standard wholesale contract[2] are attached to the TPA. The wholesale contract includes section 11, discussing chargebacks by Penney. Section 11 states, "[Penney] may issue a chargeback against [NI's] account for any other cost or expense of [Penney] or any Reseller Purchaser for which [NI] is responsible. . . ." The same section also permits Penney to issue chargebacks for late merchandise. Furthermore, section 25 of the wholesale contract allows Penney to setoff against any amounts payable to NI "all present and future indebtedness of [NI] to Penney arising from [the TPA] or any other transaction or occurrence."

The wholesale contract states all chargebacks will be issued in accordance with Penney's billing instructions, which are incorporated by reference. The billing instructions declare that Penney requires, among other things, Advance Ship Notice ("ASN")[3] and prohibits invoicing prior to shipment of goods. The billing instructions also provide that chargebacks will issue for anticipation on early payment of invoices.

Ryan Koon, Penney's area manager over debit balance, supplier control, fixed assets, and post-audit, testified that ASN compliance represents a course of dealing between Penney and its suppliers.[4] The testimony of Sandra Menichelli, chief financial officer for NI, revealed NI was aware of Penney's ASN compliance requirement. Although NI passed the Penney tests for ASN capability, NI never provided an ASN to Penney for any of the orders it filled.[5] Trial testimony revealed that when a supplier fails to provide an ASN, Penney is obliged to physically inspect the merchandise and prepare its own ASN to direct merchandise to the appropriate store. Penney contends this process was both costly and time consuming to Penney.

Because NI failed to comply with the ASN requirements, Penney allocated the cost of completing NI's ASN obligation against NI's invoices in the form of chargebacks. In addition, Penney issued Chargeback No. ANT1–52 for the cost incurred by Penney due to NI's early invoicing and shipping of goods. Steve Flunker, compliance director of Penney from 2004 to 2007, testified that when NI's invoices were processed, NI received credit but fell to a negative balance due to a lack of ASNs.

Menichelli testified that on or about July 10, 2002, she called Aaron Bonham, a buyer for Penney, and reached an agreement that NI would not be responsible for any further chargebacks. The record includes an email of the same date sent by Menichelli to Bonham, stating, in pertinent part, as follows:

Also, as we discussed, Nazareth Int'l will be responsible only for the 5 percent chargeback for late delivery and any chargeback associated with deficient UPS labels. Nazareth Int'l will not be responsible for any other chargebacks

2. Each wholesale contract would cover a specific purchase order.

3. An ASN is an electronic notification from a supplier to Penney forwarded in advance of a shipment which provides information regarding the contents of a shipment and when Penney may expect to receive the shipment.

4. Section 3.3.2 of the TPA states that the "conduct of the parties under this Agreement,

including the use of Documents and Transmissions properly transmitted, will, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of this Agreement, any Transaction and any other written agreement described in Section 3.1."

5. Sandra Menichelli agreed NI was 0% ASN compliant.

related to these goods. If this is not your understanding, please contact me as soon as possible so that we can resolve any difference. . . .

Menichelli testified that she did not receive a response from Bonham. Bonham, on the other hand, testified that he called Menichelli and told her that he was not authorized to make an agreement on behalf of Penney that waives chargebacks to NI. He stated he made no agreements with Menichelli, and Menichelli acknowledged at trial that the modification was not signed by a Penney representative.

On August 22, 2002, Menichelli sent an email to Bonham which complained that NI:

> . . . received notice of numerous and substantial chargebacks from [Penney] relating to shipments from [NI] to [Bonham's] department. . . . As you may recall, we had agreed on [NI] being responsible for the 5% chargeback for late delivery where appropriate but for no other chargebacks. As best we can tell with the limited information we have received to date, most of these charges relate to missing/late ASN and the like. . . .

Kevin Persons, manager of supplier compliance for Penney, testified that he saw nothing from Bonham regarding an agreement with Menichelli on chargebacks to NI and that Bonham would not have had the authority to make such an agreement. Persons sent an email, dated October 22, 2002, to Menichelli indicating Penney agreed to a 100% reversal of offsets assessed during the 60 day grace period for new suppliers. However, Persons stated, "[Penney] is not offering to reverse any valid offsets assessed after week 26." Furthermore, Persons testified that he asked Bonham whether he had made an agreement with Menichelli regarding chargeback reversals and Bonham said

"no." Persons stated that he told Menichelli there was no agreement to waive chargebacks to NI. The record includes a December 31, 2002 email from Persons to Menichelli:

> Sandy, I spoke to [Bonham] about this. He assured me he made no agreements with you regarding reversals. . . . However, I must state in the spirit of partnership [Penney] reversed over $281,000 of offsets for [NI] in late October. At that time we made it clear this was a one time reversal and we would not reverse additional offsets.

NI filed suit against Penney and alleged the following causes of action in its third amended petition: (1) breach of contract; (2) action for the price; (3) fraud; (4) negligent misrepresentation; and (5) usury. Following the jury's verdict, the court entered a take-nothing judgment in favor of Penney and awarded costs to Penney in the amount of $5,131.40. This appeal ensued.

### Standard of Review

When a party who had the burden of proof in the trial court raises factual sufficiency on appeal, we must examine the entire record to determine if there is some probative evidence to support the finding and then determine whether in light of all the evidence, the finding is manifestly unjust. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex.1973). *See also Cenveo Corp. v. Dallas Cent. Appraisal Dist.*, 260 S.W.3d 713, 715 (Tex.App.-Dallas 2008, no pet.) (when a party complains about the factual sufficiency of the evidence, it must show the adverse finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust).

### Discussion

In its first issue, NI contends the jury's finding that Penney paid the price for the

apparel it accepted from NI was against the great weight and preponderance of the evidence. Specifically, Nazareth argues the jury's answers to questions 1 and 4 are contradictory when the evidence demonstrates that Nazareth received less in payments than it invoiced for the goods sent to Penney. The jury answered the following relevant questions:

**QUESTION NO. 1:**

Did JCPenney agree to purchase from Nazareth International, Inc.:

a. Apparel having an agreed value of $715,678 during the year 2002.

**ANSWER:** Yes

b. Apparel having an agreed upon value of $33,730.25 in February 2003.

**ANSWER:** Yes

c. T–Shirts held for sub-division 422 having an agreed upon value of $46,760.04, less resale of $13,317.60.

**ANSWER:** No

**QUESTION NO. 2:**

Did Nazareth International, Inc. and JCPenney agree to the following terms: Nazareth International, Inc. will be responsible only for the 5% chargeback for late delivery and any chargeback associated with deficient UPS labels, and for no other chargebacks.

**ANSWER:** No

. . .

**QUESTION NO. 4:**

Did JCPenney fail to pay the price of the apparel that it accepted from Nazareth International, Inc.?

**ANSWER:** No

■ An action for the price of goods is permissible when the buyer failed to pay the price of goods as it became due. *See Bacchus Indus., Inc. v. Frontier Mech. Contractors,* 36 S.W.3d 579, 584 (Tex.App.-

El Paso 2000, no writ) (Texas' adaptation of the Uniform Commercial Code states: "When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price (1) of goods accepted . . . ."(citing Tex. Bus. & Com.Code Ann. § 2.709(a)(Vernon 1994)). However, the buyer may deduct from such balance damages owed for goods not conforming to the parties' contractual terms. *See* Tex. Bus. & Com.Code Ann. § 2.717 (Vernon 2009) (the buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract)). We conclude it was not contrary to the evidence presented at trial for the jury to conclude an action for the price could not stand, given Penney's payments to NI less chargebacks.

■ During trial, Menichelli confirmed NI received payment from Penney in November of 2002 (less all chargebacks and holds) and agreed that when she says "Nazareth International wasn't paid between May through November, it was also being charged back for an amount in excess of the invoice for the same period . . . ." Flunker testified that once payment comes through, Penney pays the invoice, but NI "racked up so many other charges to process the goods that it could potentially exceed the total cost of merchandise in the agreement." Flunker also testified that if NI owes Penney more money than it was invoicing, NI would not get a check for the balance. Koon testified that the majority of chargebacks assessed against NI dealt with lack of ASN compliance. As previously noted, Menichelli admitted NI was 0% ASN compliant. Thomas Moriarty, manager of EDI compliance for Penney, and Flunker

stated that no supplier is excused from Penney's ASN compliance requirements.

NI contends that only $471,593.46 had been paid to NI for the apparel valued at $749,408.25 and *"standing alone,* this would call into question the Jury's answer to Question No. 4." (emphasis added). We disagree. The record before us contains more than the amount invoiced by NI and the amount ultimately paid by Penney. We must consider the chargebacks as factoring into the propriety of Penney's overall payment amount just as the jury could have reasonably considered them.[6] Because the evidence demonstrates NI was paid the value of goods received (less all chargebacks and offsets), the jury's finding that Penney paid for the merchandise received is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Cenveo,* 260 S.W.3d at 715. We overrule NI's first issue.

■ In its second issue, NI contends that the jury's finding that Penney did not loan money to NI was against the great weight and preponderance of the evidence. NI correctly states that under Texas law, the elements of a usury claim are: (1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower. *First Bank v. Tony's Tortilla Factory,* 877 S.W.2d 285, 286 (Tex.1994). The jury's finding that Penney did not provide a loan, therefore, defeated the first element of NI's usury claim.

■ Specifically, NI argues Chargeback ANT1-52 was a loan because it describes the monies advanced by Penney and the rate and amount of interest charged for the transaction. Koon testified a chargeback is not a loan to a supplier and Penney does not make loans to its suppliers. Rather, Koon described Chargeback No. ANT1-52 as an "anticipation"—the cost of the monies incurred by the supplier's early shipment of the goods. Menichelli agreed that at no time in her dealings with Penney did Penney loan money to NI. Based upon this evidence, we conclude the jury's finding that there was no loan was not so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cenveo,* 260 S.W.3d at 715. We overrule NI's second issue.

■ Next, NI complains the jury's finding that Penney committed no fraud against NI was against the great weight and preponderance of the evidence. The elements of fraud are: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made the statement recklessly without any knowledge of the truth; (4) the speaker made the representation with the intent that the other party should act on it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). The misrepresentation may consist of the concealment or non-disclosure of a material fact when there is a duty to disclose. *Custom Leasing, Inc. v. Tex. Bank & Trust Co.,* 516 S.W.2d 138, 142 (Tex.1974).

■ In essence, NI argues Penney committed fraud by issuing chargebacks against NI due to missing or invalid ASNs when the contracts governing the relation-

---

**6.** We note the court's charge did not ask the jury to consider the appropriateness ·of the chargebacks issued by Penney and, thus, we do not consider it on appeal. TEX.R. CIV. P.

279; *Martin v. Birenbaum,* 193 S.W.3d 677, 684 (Tex.App.-Dallas 2006, pet. denied) (party waived the issue by failing to submit it to the jury for determination).

ship did not provide for such chargebacks. We disagree.

Section 11 of the wholesale contract attached to the TPA states, "[Penney] may issue a chargeback against [NI's] account for any other cost or expense of [Penney] or any Reseller Purchaser for which [NI] is responsible...." Furthermore, section 25 of the wholesale contract permits Penney to setoff against any amounts payable to NI for all present and future indebtedness of NI to Penney arising from the TPA or any other transaction or occurrence. The wholesale contract states all chargebacks will be issued in accordance with Penney's billing instructions, which are incorporated by reference. The billing instructions discuss the requirement for suppliers issuing ASNs. Section 3.3.2 of the TPA states that the conduct of the parties evidence a course of dealing accepted by the parties. Koon described the ASN requirement as a "course of dealing." The jury also heard testimony from Persons that an appropriate ASN is the fundamental of a "floor-ready process." Flunker testified that if there is no ASN, Penney incurs time, labor, and money. Menichelli's testimony revealed NI was aware of the ASN compliance requirements but NI remained 0% ASN compliant. Thus, the jury could have reasonably determined that NI's failure to provide ASNs cost Penney money and NI was on notice that the agreements permitted chargebacks in this situation. Thus, the jury's conclusion of no fraud was supported by the evidence. *Cenveo*, 260 S.W.3d at 715. We overrule NI's third issue.

 Finally, NI contends the jury's finding that Penney's agent, Bonham, did not make a negligent misrepresentation, upon which NI relied, was against the great weight and preponderance of the evidence. A negligent misrepresentation cause of action has four elements: (1) the

representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n. 24 (Tex.2002). NI argues Bonham negligently misrepresented that he had the authority to prevent the assessment of certain chargebacks while he continued to accept goods from NI. NI further contends Bonham knew NI was relying upon his false representations, yet Bonham chose to keep silent so the garments he needed would be shipped without interruption.

At the center of NI's argument is the July 10, 2002 email from Menichelli to Bonham in which she states:

> Also, as we discussed, Nazareth Int'l will be responsible only for the 5 percent chargeback for late delivery and any chargeback associated with deficient UPS labels. Nazareth Int'l will not be responsible for any other chargebacks related to these goods. If this is not your understanding, please contact me as soon as possible so that we can resolve any difference....

Contrary to Menichelli's testimony, Bonham testified that he called Menichelli and told her that he was not authorized to make an agreement on behalf of Penney that waives chargebacks to NI. He stated he made no agreements with Menichelli. Persons testified that he saw nothing from Bonham regarding an agreement with Menichelli and that Bonham would not have had the authority to make such an agreement. Persons sent an email dated October 22, 2002 to Menichelli which stat-

ed, "[Penney] is not offering to reverse any valid offsets assessed after week 26." Furthermore, Persons testified that he asked Bonham whether he had made an agreement with Menichelli regarding chargeback reversals and Bonham said, "No." Persons testified that he told Menichelli there was no agreement to waive chargebacks to NI. A December 2002 email from Persons to Menichelli states that Bonham "assured me he made no agreements with you regarding reversals. . . . At that time we made it clear . . . we would not reverse additional offsets."

 The jury had the right to believe one witness, and disbelieve another, or to believe part of the testimony of the witness and disbelieve any other part. *See Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 50 (Tex.App.-San Antonio 2006, no pet.); *Schwab v. Stewart*, 387 S.W.2d 939, 943 (Tex.Civ.App.-Amarillo 1964, writ ref'd n.r.e.). Thus, the jury's determination that Bonham did not make a negligent misrepresentation was supported by the evidence. *Cenveo*, 260 S.W.3d at 715.

In addition, Menichelli acknowledged that her email would constitute a change to the parties' agreement and the modification was not signed by a Penney representative. Section 3.1 of the TPA requires any modifications to the agreement to be made in writing as follows:

> . . . any modification to this or those agreements must be approved by the parties in writing. . . . If any other document, whether in written or electronic form, contains any language which would modify, release or discharge [NI] from any of its obligations under this Agreement or any agreement referenced in the Appendix, that language will be of no effect unless reference is made, in writing, to this Section 3.1 and/or to the other agreement and, in either case, the document is acknowledged and accepted

in writing by an authorized representative of Penney.

Thus, under the terms of the TPA, NI was aware Bonham could not have agreed to Menichelli's chargeback reversals without such modification being approved by both parties in writing. In light of the evidence, we determine the jury's finding of no negligent misrepresentation on the part of Bonham was not so against the great weight of the evidence as to be manifestly unjust. *Cenveo*, 260 S.W.3d at 715. We overrule NI's final issue.

Having overruled all of NI's issues, we affirm the judgment of the trial court.